**JACK'S WHOLESALE WINDOWS and Design of Hammond, Inc., Appellant,**

v.

**REVIEW BOARD OF INDIANA DEPARTMENT OF WORKFORCE DEVELOPMENT and Karen M. Bulmermarsh, Appellees.**

No. 93A02–0401–EX–34.

Court of Appeals of Indiana.

Oct. 26, 2004.

Lester F. Murphy, Murphy Law Firm, Tampa, FL, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Jack's Wholesale Windows and Design of Hammond, Inc. (Jack's) appeals a decision of the Unemployment Insurance Review Board, Indiana Department of Workforce Development (the Review Board), affirming an administrative law judge's (ALJ's) decision to grant unemployment benefits to Karen M. Bulmer–Marsh. Jack's presents several issues, but we address only the following issue, which is dispositive of the appeal:

> Did the review board err in refusing to allow Jack's to introduce evidence in the hearing before the ALJ to rebut a claim not raised until after the hearing deputy's decision with respect to a reason Bulmer–Marsh quit her job?

We reverse and remand.

The facts favorable to the Review Board's decision are that Bulmer–Marsh began working for Jack's on July 26, 1999. At the time she separated from Jack's, Bulmer–Marsh was in charge of, among other things, billing customers and scheduling for the installers. Bulmer–Marsh also leased a van from Jack's. At some point, the van was vandalized, resulting in property damage. Bulmer–Marsh obtained an estimate for repairs and Jack's issued a check made out to the repair shop for $3362.68. Bulmer–Marsh went to the repair shop and explained that she would have to take the van to several different places to repair the damage (e.g., an electronics store to repair or replace the vehicle's sound system), and asked the repair shop to endorse the check over to her, which it did. Bulmer–Marsh deposited the

check in her own account and kept $1000 of the proceeds.[1] According to Bulmer–Marsh, JoAnn Lewis (Lewis) "told me that I could use it as I wanted to. Either fix part of the van and use the rest of it to fix breaks [sic] and stuff." *Appellant's Appendix* at 7.

Bulmer–Marsh described Lewis as a vice-president of Jack's. In fact, Lewis was a temporary store manager, not a vice-president. Lewis's son, Christopher, is also relevant to these proceedings. He worked as an installer for Jack's, but did not have a driver's license, because it had been suspended. Bulmer–Marsh was aware of that fact, she claimed, because her job responsibilities included sending copies of the driver's licenses of Jack's installers, who were required to drive company vehicles to job sites. Bulmer–Marsh had asked Christopher to provide a copy of his license, but he was unable to do so. Apparently, Bulmer–Marsh felt pressure from Lewis not to report the fact that Christopher was driving illegally. Bulmer–Marsh testified that when the company's corporate office called to inquire as to the whereabouts of the paperwork reflecting Christopher's valid license, she would "makeup [sic] something that [she] didn't get it from him, or [she] forgot to get it from him." *Id.* at 11.

Shortly after she deposited the repair check in her personal account, Bulmer–Marsh was told by Lewis that Jack Tilka, the owner of Jack's, learned she had done so. Lewis told Bulmer–Marsh that she (Lewis) was going to "fix it." *Id.* at 17. Bulmer–Marsh was informed that the corporate office had already put a stop-pay on the check. Bulmer–Marsh called Tilka and asked why Jack's "had embarrassed [Bulmer–Marsh] like that[.]" *Id.* at 17.

She also asked to be allowed to keep the money in her account so she could pay the various repair bills. According to Gail Moran, a store manager for Jack's, Tilka "told her absolutely not, that she was to return the check, and he would make up separate checks for the different vendors[.]" *Id.* at 15. Before the bank was able to act on the stop-pay order, Bulmer–Marsh had already withdrawn some of the money from her account. The bank was able to recover only $2200 of the original $3362.68.

On January 30, 2003, Bulmer–Marsh went to Lewis and announced she was quitting. She gave two reasons for leaving. First, she claimed the company embarrassed her by putting a stop-pay order on the repair check. Second, she claimed she was tired of having to cover up Christopher's illegal activities, i.e., driving a company truck without a license. Not surprisingly, Lewis did not communicate the second reason to other Jack's personnel.

Bulmer–Marsh submitted a claim for unemployment benefits and Jack's challenged the claim on grounds that she voluntarily left her employment without good cause. A hearing was conducted before a hearing deputy, who entered the following conclusions in denying Bulmer–Marsh's claim:

> The claimant voluntarily left employment without good cause in connection with the work. It cannot be established the claimant attempted to resolve the dissatisfaction prior to leaving the employment. The claimant is ineligible for benefits in accordance with I.C. § 22–4–15–1. The employer is relieved of charges per I.C. § 22–4–11–1(d)1. Benefits are reduced and suspended as shown below.

**1.** According to Bulmer–Marsh, "The van ends up getting it all back except for a thousand dollars of it." *Appellant's Appendix* at 8.

*Id.* at 23. Bulmer–Marsh appealed that ruling and a hearing was conducted by an ALJ. The ALJ reversed the decision of the hearing deputy, entering the following conclusions:

> In this case, the claimant gave two reasons for separating from the employment. The first reason was because she was embarrassed because the employer put a stop payment on a check made payable to an auto body repair shop, which was then signed over by the repair shop to the claimant. The ALJ cannot conclude that the claimant has shown good cause for separation from the employment based upon her embarrassment as a result of the stop payment on the check. However, the claimant also gave a second reason for separating from the employment, which she made known to the employer at the time of separation. The claimant indicated that she was separating from the employment as a result of the vice president's son illegally operating one of the employer's vehicles. The claimant was in charge of sending copies of the employee's [sic] driver's licenses to the corporate office. The claimant asked the vice president's son for a copy of his driver's license, and he was unable to present his driver's license. The vice president's son did not have a valid driver's license, but was operating the employer's vehicle regardless. The claimant knew that the individual in question was illegally operating his vehicle. The claimant told the vice president that her son did not have a valid driver's license to operate the employer's vehicle. The claimant wrote a letter to the owner of the company to make him aware of the fact that an individual was illegally operating his vehicle. When nothing was done about the matter, the claimant quit the employment. The ALJ concludes that the claimant's reason for leaving the employment, namely that an individual was operating the employer's vehicle without a valid driver's license, of which the claimant was responsible for sending the copies of the driver's licenses to the employer, demonstrated good cause for separating from the employment. The claimant's reason for leaving the employment was objectively related to the employment, and the reasonable person would have left the employment as well. Therefore, based on the evidence, the ALJ concludes that the claimant has met the burden of proving that she separated from the employment for good cause in connection with the work pursuant to I.C. § 22–4–15–1.

*Id.* at 32. Jack's appealed the ALJ's decision to the Review Board, which affirmed the grant of benefits to Bulmer–Marsh. Jack's appeals the decision of the Review Board.

█ Our standard of review when considering decisions of the Review Board is governed in part by statute. Ind.Code Ann. § 22–3–4–8(b) (West, PREMISE through 2003 1st Regular Sess.) provides that an "award by the full board shall be conclusive and binding as to all questions of fact, but either party ... may ... appeal to the court of appeals for errors of law under the same terms and conditions as govern appeals in ordinary civil actions." This reflects a deferential standard of review with respect to the Review Board's findings of fact, the determination of which may not be disturbed unless the evidence is undisputed and leads undeniably to a contrary conclusion. *Metropolitan School Dist. of Lawrence Township v. Carter,* 803 N.E.2d 695 (Ind.Ct.App.2004). The first step is to review the findings to determine if there is any competent evidence of probative value in the record to support them. *Id.* When conducting this review, we neither reweigh the evidence

nor reassess witness credibility. Instead, we consider only the evidence and accompanying reasonable inferences most favorable to the Review Board's decision. *Id.* "After reviewing the sufficiency of the evidence supporting the findings, we determine whether those findings are sufficient to support the judgment." *Id.* at 697. We note also the Review Board's decisions may be challenged as contrary to law. In such cases, we review determinations of specific or basic underlying facts, conclusions or inferences drawn from those facts, and legal conclusions. *City of Blmington v. Review Bd. of Dep't of Workforce Dev.*, 794 N.E.2d 1143 (Ind.Ct.App.2003).

■ Jack's contends the Review Board erred in refusing to allow Jack's to introduce evidence at a hearing to rebut a claim not raised until the ALJ hearing. The claim in question concerned the reason Bulmer–Marsh quit her job. Central to the argument are the assertions that, at the hearing before the hearing deputy, Bulmer–Marsh gave only one reason for quitting (i.e., embarrassment over the decision made by Jack's to stop payment of the repair check), and that the hearing deputy initially denied the application because she rejected that as a qualifying reason. The appellate materials do not contain any information relating to the proceedings before the hearing deputy except the Indiana Workforce Development Determination of Eligibility Form that memorialized the deputy's decision. Therefore, there is no transcript reflecting such was, in fact, the only rationale initially given by Bulmer–Marsh for quitting. It is significant, however, that Bulmer–Marsh does not deny that was the case. Moreover, that would be consistent with the materials filed by Jack's in relation to Bulmer–Marsh's separation from employment and subsequent application for benefits. Those materials included the following: (1) An Employee Status Change Form, which was filled out by Lewis shortly after Bulmer–Marsh quit and which states, "Walked off job—after theft said she quit, gave me her keys." *Appellant's Appendix* at 9; (2) a Department of Workforce Development (DWD) form entitled "Unemployment Insurance Request for Information", on which Jack's was asked to describe the circumstances of Bulmer–Marsh's leaving; the information provided focused exclusively upon the situation involving the insurance check; and (3) a DWD form entitled "Separating/Base Period Employer Notice", on which Jack's described Bulmer–Marsh's termination as follows:

> Karen Bulmer abandoned her position with no notice; therefore this is a *formal employer protest* against Karen Bulmer's eligibility to receive [sic] unemployment benefits under Jack's Wholesale Windows ...
>
> Karen Bulmer was leasing a company owned vehicle that was vandalized, while in her possession. She cashed a Jack's Wholesale Windows company check that was payable to the auto repair shop and deposited the funds into her own personal bank account. When questioned in regards to her action, she quit, handed in her keys, and left the building....

*Id.* at 12 (emphasis in original).

The foregoing would indicate that Jack's was not aware, and indeed had no reason to suspect, that it would have to respond to an additional reason for quitting offered by Bulmer–Marsh at the hearing before the ALJ. We note that there is nothing built into the process of appealing the hearing deputy's decision that would convey such information to Jack's. For instance, the record contains a form entitled "Notice of Appeal" that was completed by Bulmer–Marsh in appealing the Deputy's denial of benefits. On that form, she cited the following as the reason she disagreed with

the decision: "I left Jack's Wholesale due to being continuely [sic] made to cover illegal activities of Christopher D. His mother was Vice–President, (Joan) but I had also made the owner aware of problems by letter." *Id.* at 23. A copy of that form was not provided to Jack's, however, in notifying Jack's of the appeal. It therefore appears that Jack's challenged Bulmer–Marsh's application for benefits at the hearing before the deputy on the only ground for quitting then known to it, i.e., the repair check. When that decision was appealed, it is obvious from the record that Jack's prepared its case for the proceeding before an ALJ by marshalling evidence to refute what it believed to be the sole basis for Bulmer–Marsh's quitting. As it turned out, however, Bulmer–Marsh introduced a second reason at the ALJ proceeding.

The appeal hearing was conducted before ALJ Lisa Hancock. ALJ Hancock asked Bulmer–Marsh, "[W]hat reason did you give for quitting?" *Transcript of ALJ Hearing* at 7. Bulmer–Marsh responded,

> I had been leasing a van from Jack's Wholesale Windows, and she had gotten me the higher price insurance when it was broken into and wrecked, and told me that I could use it as I wanted to. Either fix part of the van and use the rest of it to fix the breaks [sic] and stuff. And then when Jack found out, she ended up calling the bank and embarrassing me.

*Id.* After Bulmer–Marsh described the repair check incident in further detail, Hancock asked, "So after Joann calls the bank and puts a stop payment on that check, you quit?" *Id.* at 10. Bulmer–Marsh responded, "Uh-huh. It wasn't only because of that. It was because I was tired of her lying to Jack and her son driving without a license and covering for her constantly." *Id.* Upon questioning, Bulmer–Marsh went on to describe the situation involving Christopher's non-existent driver's license. There is no question that this second reason was unknown to Jack's, and the witnesses sent by Jack's to the hearing were unable to comment upon, much less refute, the factual allegations underlying this second—and new—reason for quitting.

Attending the hearing before the ALJ on behalf of Jack's were store manager Moran and Sharyn Pferschy, identified as a store co-manager. They appear to have been knowledgeable about matters pertaining to the repair check. When asked by ALJ Hancock whether she knew "anything about" Christopher driving without a valid driver's license, Moran responded, "No, I do not." *Id.* at 13. ALJ Hancock moved away from that topic, stating, "I'm not going to ask you any more questions about that because you can't really answer." *Id.* at 14. At the end of her testimony, Moran was asked if she had any final comments, to which she responded: "No, just that when she was questioned by Joann Lewis about what took place about depositing the money in her personal account after she was told not to, that she handed over the keys and said that she quit." *Id.* at 16. ALJ Hancock responded to that by asking Moran, "Were you present?" *Id.* Moran responded that she was not. ALJ Hancock asked Pferschy the same question, and received the same answer. Pferschy did not otherwise participate in the hearing.

The foregoing conclusively demonstrates that the Jack's personnel who represented their employer at the ALJ hearing were ignorant of any facts relevant to Bulmer–Marsh's second reason for quitting, and thus incapable of challenging Bulmer–Marsh's claim on that basis. The question we must answer is, does Jack's ignorance of Bulmer–Marsh's second reason for quitting render the Review Board's decision to affirm without conducting a hearing at

which Jack's could present evidence on that issue erroneous as a matter of law? We hold that it does.

■ We note first that the Review Board may, of course, base its decision entirely on a record made before a referee or an ALJ. *Frederick v. Review Bd. of Indiana Employment Sec. Div.*, 448 N.E.2d 1230 (Ind.Ct.App.1983). When that occurs, there is a presumption that the parties were given an opportunity during those prior proceedings to fully litigate the dispositive issues, which would include the opportunity to present all evidence relevant to whatever factual questions must be resolved. Jack's was not afforded that opportunity in this case. At the hearing before the hearing deputy, Bulmer–Marsh apparently focused her argument that she quit for good cause entirely upon the factual assertion that she left because Jack's had embarrassed her by putting a stop-pay order on the repair check. Therefore, Jack's appeared at the hearing with evidence to refute Bulmer–Marsh's claim that the stop-pay order was somehow inappropriate, and that her quitting for that reason was justified. Jack's did this by attempting to portray the stop-pay order as reasonable. It appears to this court that, in doing so, Jack's went further and sought to create the implication that Bulmer–Marsh was guilty of malfeasance with respect to the repair check. In any event, the hearing deputy determined that quitting because of the repair check did not constitute leaving the employment for good cause in connection with the work, as is required for benefits eligibility. Based upon its employment records, the proceedings before the hearing deputy, and the notification it received concerning the appeal to the ALJ, Jack's reasonably believed the issue at the ALJ proceeding would be the same as before.

■ We note here that it cannot fairly be said that Jack's in any way acquiesced in the introduction of what amounted to a new issue at the ALJ hearing. Rule 15(B) of the Indiana Rules of Trial Procedure provides that even when an issue is not raised by the pleadings, it may nevertheless be treated as though it were if it is tried by express or implied consent of the parties. That principle does not apply, however, unless both parties litigate the new issue. *See Hacker v. Review Bd. of Indiana Employment Sec. Div.*, 149 Ind. App. 223, 271 N.E.2d 191 (1971). As reflected above, Jack's was not prepared to and in fact did not litigate the issue of Christopher's driver's license.

Finally, and significantly, in an affidavit submitted to the Review Board in conjunction with its appeal, Jack's demonstrated there are disputed issues of fact created by the evidence it did not have an opportunity to introduce that might well affect the outcome of its appeal. The following excerpts from the affidavit illustrate that point:

3. Prior to appearing at [the ALJ] hearing, neither I nor my company had any notice that the claimant Karen Bulmer–Marsh had changed the basis upon which she claimed entitlement to unemployment benefits, by adding to her claim of being embarrassed over the exposure of her theft of our check for the repair of the vehicle she was leasing from us, that additionally she was covering for illegal activities of an independent contractor, Christopher Deinert, whose mother was her superior nor that she claimed she had made me aware of such problems by a letter.

4. At no time prior to such July 2, 2003 hearing, was I or my company aware that the notice of appeal which Karen Bulmer–Marsh sent to the Indiana Department of Workforce De-

velopment dated May 27, 2003 gave this additional basis for her appeal, accordingly, the two (2) representatives I sent to the July 2, 2003 hearing were not knowledgeable as to the facts necessary to defend against such new claim nor did they have exhibits with on [sic] such and nor could they testify on such issue.

5. At no time prior to March 18, 2003, was I aware Christopher Deinert's driving privileges had been suspended or that he had an invalid driver's license, and when I learned of such facts on March 18, 2003 he was immediately terminated.

6. Joanne Lewis, the mother of Christopher Deinert, was temporary Store Manager at the time Ms. Bulmer–Marsh quit on January 30, 2003, not a Vice President of the company.

7. Following the termination of Christopher Deinert, I conducted an inquiry as to how it came about he was working without possessing a valid driver's license, and as a result of such investigation and other related reasons Joanne Lewis was removed from her managerial functions with my company, but continued in a non-managerial position, from which position she quit on April 28, 2003, which is the subject matter of her pending unemployment claim.

\* \* \* \* \* \*

9. Contrary to the testimony of Ms. Bulmer–Marsh in the transcript received from the July 2, 2003 hearing, she never wrote any letter to me prior to quitting on January 30, 2003, my corporate office in Schoolcraft, Michigan has no record of ever receiving any letter or any other information from her regarding an invalid driver's license of any subcontractor or employee, and at no time did she ever tell me that there was

a problem with Christopher Deinert's driving privileges.

\* \* \* \* \* \*

12. Even after Ms. Bulmer–Marsh quit, she never advised me of any problem with Christopher Deinert's driving privileges.

13. Contrary to Ms. Bulmer–Marsh's testimony at the July 2, 2003, hearing, the Install Manager was in charge of confirming subcontractor's possession of a valid driver's license, which would have included Christopher Deinert's driver's license, this was not the responsibility of Ms. Bulmer–Marsh nor within her job function.

*Id.* at 1–4.

Reviewing Tilka's affidavit, it is clear that he challenges some of the foundational facts that underlie Bulmer–Marsh's claim for benefits—alleged facts that were established at the ALJ hearing. As that claim (i.e., Bulmer–Marsh quit because of the alleged driver's license cover-up) was not presented to the hearing deputy in the prior proceeding, and unknown to Jack's at the time of the ALJ hearing, Jack's has not had an opportunity to refute it. We note also that Bulmer–Marsh's success may well depend at least in part upon the Review Board's assessment of her general credibility. That assessment is made not only with respect to the truthfulness of her assertions concerning the foundational facts, but with other, tangential facts as well. Tilka's affidavit challenges the accuracy, and perhaps the credibility, of some of the assertions made by Bulmer–Marsh with respect to some of those tangential facts.

In the final analysis, we must agree with Tilka's formulation of the appropriate legal conclusion in this case: "Without the ability to offer rebuttal evidence to the new issue about the lack of a driver's license in

**514**

respect to Christopher Deinert, [Jack's] has been deprived of a fair hearing and [its] right to confront the witness on her surprise evidence." *Id.* at 5. Put more succinctly, Bulmer–Marsh's factual assertions on the claimed second reason for quitting have not been put to the test. We therefore must remand with instructions to the Review Board to conduct a fact-finding hearing to that end.

Judgment reversed and remanded.

BAKER, J., and DARDEN, J., concur.